**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**STEWART PRICE**                                    **CIVIL ACTION**

**VERSUS**                                           **NO. 03-3066**

**N. BURL CAIN, WARDEN**                             **SECTION: "F"(5)**

### REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. §2254(e)(2). Accordingly, it is recommended that the petition be **DISMISSED WITH PREJUDICE**.

### I. PROCEDURAL HISTORY

Petitioner, Stewart Price, is a state prisoner currently incarcerated in the Louisiana State Penitentiary, Angola, Louisiana. On May 22, 1997, petitioner was found guilty, following trial by jury, of four counts of first-degree robbery and one count of simple robbery. On December 3, 1997, the trial court sentenced

petitioner, with respect to each of his first-degree robbery convictions, to concurrently-running twenty-year sentences. The court also sentenced petitioner, in connection with his simple robbery conviction, to a seven-year term of imprisonment to be served concurrently with his twenty-year sentences. Upon subsequently adjudicating petitioner to be a third-felony offender, the trial court vacated the twenty-year sentence imposed in connection with one of his first-degree robbery convictions and resentenced him to life imprisonment as to that count.

Petitioner directly appealed his conviction and accompanying sentences which were affirmed by the Louisiana Fourth Circuit Court of Appeal on November 3, 1999. State v. Price, 752 So.2d 995 (La. App. 4th Cir. 1999)(table).[1]/  Petitioner sought relief from the Louisiana Supreme Court in connection with the Fourth Circuit's adverse decision, but his writ applications to that tribunal were likewise denied. State ex rel. Price v. State, 780 So.2d 1065 (La. 2001); State v. Price, 777 So.2d 474 (La. 2000).

Following the conclusion of his direct criminal appeal, petitioner sought post-conviction relief from the state courts. His efforts in this regard culminated on October 3, 2003 when the Louisiana Supreme Court denied his writ application. State ex rel. Price v. State, 855 So.2d 294 (La. 2003).

---

[1]/ A copy of the Louisiana Fourth Circuit's unpublished opinion is contained in the State rec., vol. 3 of 10.

2

In the instant federal habeas corpus action, petitioner raises the following claims: 1) trial court improperly denied his <u>Batson</u> challenge; 2) trial court improperly allowed testimony regarding an out-of-court identification of petitioner; 3) his habitual offender adjudication was improper since the evidence, with respect to one of his predicate offenses, was insufficient to reflect that his plea of guilty was based upon a voluntary waiver of his rights; 4) he received an excessive sentence; and, 5) trial court erred in accepting a "defective" verdict from jury.  In its response, the State concedes that petitioner, as required by <u>Rose v. Lundy</u>, 455 U.S. 509, 102 S. Ct. 1198 (1982), has exhausted his state court remedies.[2]/  The State likewise concedes that the instant action is timely under 28 U.S.C. §2244(d).[3]/  Before proceeding to the merits of petitioner's claim, the Court shall review the applicable facts.[4]/

Tabatha Thomas was working at the McKenzie Bakery located at 3100 St. Claude Avenue on February 4, 1996 when the store was robbed.  On that date, she, along with a co-worker, Glenda Dales, was waiting for customers at about 8:20 a.m. when petitioner came

---

[2]/ <u>See</u> Federal rec., doc. # 7, State's Response at p. 2.

[3]/ <u>See</u> Federal rec., doc. # 7, State's Response at p. 4.

[4]/ The facts are taken from this Court's review of the trial transcript and the Louisiana Fourth Circuit Court of Appeal's opinion, <u>State v. Price</u>, 752 So.2d 995  (La. App. 4th Cir. 1999) (table).

into the store.  Pursuant to petitioner's instructions, Thomas opened the register drawer and petitioner took out the money. Because petitioner, during the robbery, had one hand under his shirt, Thomas believed that he had a gun.

Following the robbery, the authorities were called and New Orleans Police Officer Arnold Williams arrived on the scene to investigate the incident.  Williams received a description of the perpetrator as being a black male, approximately five feet, seven inches tall, between the ages of twenty-six and thirty-five, who had a mustache along with a "lazy" eye.

On July 2, 1996, petitioner, smoking a cigarette, entered the same McKenzie Bakery and again confronted Tabatha Thomas.  Thomas, who recognized petitioner from the first robbery, advised petitioner that he could not smoke inside the store.  After putting out his cigarette, petitioner demanded that she open the register drawer.  Thomas, once again believing petitioner was armed because "he had his hand under his shirt",[5] opened the drawer and then obeyed petitioner's command to lay on the floor.  After petitioner took the money from the register and left the store, Thomas again called the police.

New Orleans Police Officer John Duzac was called upon to investigate the July 2, 1996 robbery.  Thomas offered Duzac a

---

[5] See State rec., vol. 7 of 10, trial transcript at p. 38, lines 19-20.

description of the perpetrator comparable to the description she provided to Officer Williams following the February 4, 1996 robbery.[6]

Also investigating the July 2, 1996 robbery was New Orleans Police Officer David Petrolia.  Officer Petrolia confiscated a VHS tape from a security camera in the bakery.  The tape, however, revealed no evidence that a robbery had taken place.[7]

On August 31, 1996, the same McKenzie Bakery was again robbed.[8]  This time, a different McKenzie employee, Mary Mallett, came into contact with petitioner.  According to Mallett, petitioner, upon entering the store, hit the counter with his hand and demanded that she "give it up".[9]  At first, Mallett believed petitioner was joking.  However, after he came around the counter, she realized it was not a joke.  Once again, petitioner had his

---

[6] See State rec., vol. 7 of 10, trial transcript at pp. 71 and 72.

[7] The prosecution and defense stipulated to the fact that the bakery's security tape reflected "no robbery" and did not capture anyone resembling petitioner.  See State rec., vol. 7 of 10, trial transcript at pp. 85 and 86.

[8] The Louisiana Fourth Circuit's opinion reflects that the McKenzie Bakery robbed on August 31, 1996 was located "in the 3100 block of St. Charles Avenue".  State v. Price, No. 98-KA-1018, unpub. op. at p. 3.  However, a review of the trial transcript reflects that the robbery actually took place in the same location as the other two robberies, the 3100 block of St. Claude Avenue. See State rec., vol. 7 of 10, trial transcript at p. 138.

[9] See State rec., vol. 7 of 10, trial transcript at p. 139, lines 14-16.

hand under his shirt and Mallett thought he was armed. She acquiesced to his demand to give him the money out of the cash register. After getting the money, petitioner left the store and Mallett contacted the police.

In response to Mallett's telephone call, New Orleans Police Officer Peggy Martin arrived at the bakery to investigate the August 31, 1996 robbery.[10]/ Mallett provided Officer Martin with a description of the perpetrator, describing him as a thirty-five to forty-year old black male, approximately five feet, eleven inches tall, weighing approximately one hundred forty-five pounds. Mallett also informed Officer Martin that the perpetrator had a tattoo on his hand which looked like a star.

Mallett testified that the bakery was again robbed on September 7, 1996. On this occasion, Mallett immediately recognized the perpetrator as the same man who had robbed the store on August 31, 1996.[11]/ Once again, the perpetrator had a hand under his shirt and Mallett believed he was armed.[12]/ After receiving the

---

[10]/ In its opinion, the Louisiana Fourth Circuit stated that Officer Martin "responded to a robbery call at the McKenzie Bakery at 3100 St. Claude Avenue on August 3, 1996." State v. Price, No. 98-KA-1018, unpub. op. at p.5. However, a review of Officer Martin's trial testimony reflects that, in actuality, she responded to a call of a robbery at McKenzie's on August 31, 1996. See State rec., vol. 7 of 10, trial transcript at p. 91.

[11]/ See State rec., vol. 7 of 10, trial transcript at p. 147.

[12]/ See State rec., vol. 7 of 10, trial transcript at pp. 148 and 151.

money, petitioner left the bakery and the police were called. Mallett, once again, provided a description of the perpetrator.[13]/

The next robbery of the St. Claude Avenue McKenzie Bakery took place on September 21, 1996. Again, Mary Mallett was working at the bakery when the robbery occurred and she provided a description of the perpetrator to New Orleans Police Officer Gregory Clay.

Following the September 21, 1996 incident, New Orleans Police Officer James Anderson commenced investigating the McKenzie Bakery robberies, developing a suspect and compiling photographic lineups. Pursuant to these lineups, both Mary Mallett and Tabatha Thomas identified petitioner as the perpetrator.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") included a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) now contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law where there has been an adjudication on the merits in state court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference unless they were "'contrary to, or involved

---

[13]/ See State rec., vol. 7 of 10, trial transcript at pp. 154 and 155.

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"   Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000), cert. denied, 532 U.S. 1039, 121 S.Ct. 2001 (2001)(quoting §2254(d)(1)).   The United States Supreme Court has advised that:

> [u]nder the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000); Hill, 210 F.3d at 485.   Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill, 210 F.3d at 485 (quoting §2254(d)(2)).

**III. ANALYSIS**

**A.   Improper Denial of Batson Challenge**

During voir dire, the State used five of its peremptory challenges to excuse five black males from serving as jurors.   The defense raised a "Batson challenge", claiming that the jurors were

struck based upon their race.[14]/

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712 (1986), the Supreme Court set forth a three-step analysis to be utilized in evaluating claims of purposeful discrimination in the jury selection process. First, the defendant, as the opponent of the peremptory challenges, must make a <u>prima facie</u> showing that the prosecutor used the challenges on the basis of race. <u>Batson</u>, 476 U.S. at 96-97, 106 S.Ct. at 1723. Proof of a <u>prima facie</u> case is necessarily fact-intensive and is determined by examining a number of factors with recognition "that trial judges, experienced in supervising <u>voir dire</u>, will be able to decide if the circumstances

---

[14]/ <u>See</u> State rec., vol. 7 of 10, trial transcript at p. 14 <u>et seq</u>.

Price premises his first claim for federal habeas relief on the prosecutor's alleged improper striking of jurors on the basis of race <u>and</u> gender. In <u>J.E.B. v. Alabama</u>, 511 U.S. 127, 129, 114 S.Ct. 1419, 1421 (1994), the Supreme Court extended the protections afforded by <u>Batson</u> to claims of intentional discrimination on the basis of gender. A review of Price's trial transcript reveals that the state court judge, during a conference conducted outside of the jury's presence and without objection from the defense, declared that defense counsel "... has a Batson challenge". State rec., vol. 7 of 10, trial transcript at p. 14. In ruling on the defense's challenges, the trial court referred to them as being made under <u>Batson</u> only. <u>Id</u>. at pp. 17-22. No mention of <u>J.E.B.</u> was specifically made even though that case has been decided over three years prior to Price's trial. Although the jurors who had been excused were identified by defense counsel by gender in addition to race, counsel offered no argument that the jury that was empaneled was disproportionately female. Thus, it is questionable whether a discrete claim under <u>J.E.B.</u> was being advanced to the trial court. Be that as it may, statistics alone are insufficient to establish a case of discrimination in the striking of prospective jurors, <u>United States v. Branch</u>, 989 F.2d 752, 755 (5th Cir. 1993), and the prosecutor's explanations for striking the five jurors at issue were sufficiently neutral from both race and gender standpoints.

9

concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Id. at 97, 106 S.Ct. at 1723.  If the defendant establishes a prima facie case, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors."  Id.  "'[T]he prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e].'" Miller-El v. Dretke, 545 U.S. 231, ___, 125 S.Ct. 2317, 2324-25 (2005)(quoting Batson, 476 U.S. at 98 n.20, 106 S.Ct. at 1724 n.20)(internal quotation marks omitted).  Once the State tenders a race neutral explanation, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.  Id. See also Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71 (1995); Batson, 476 U.S. at 98, 106 S.Ct. at 1724.  Under Batson and its progeny,"the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768, 115 S.Ct. at 1771 (citation omitted).

A review of the trial transcript reveals that the trial court, outside the presence of the jury, informed the prosecution that defense counsel, Ms. Cole, had made a "Batson challenge". Thereafter, defense counsel offered the following in support of her challenge:

MS. COLE:

    Your Honor, for the record, the first juror called was Alan Wilford, a Black male, excused by the state. The second jur[or] that was called was Mr. Glazer, the

10

second Black male [who was accepted by the state].   The third, Jason Forrest, Black male, excused by the state. The fourth, Aaron Celestine, Black male, excused by the state.   There were no other Black males called until Jerome Stephenson, Black male, excused by the state. That was the first eighteen jurors.  Of those, there were [five] Black males on the panel, [four] were excused by the state.[15]/   In the second group of eighteen, [the first black male was] Mr. Harbour who was excused for cause....   [The next black male was] Mr. Wilmut Washington who was ... excused by the state.  Making a total of one, two, three, four, five ... Black males on the panel excused by the state....[16]/

In response, the trial court called upon the prosecutor, Mr. Dugan, to provide neutral explanations for challenging the five black male prospective jurors:[17]/

MR. DUGAN:
    Your Honor, for [the] state's cut number one, Mr. Alan Wilford.  Mr. Wilford indicated in voir dire that he wanted to see the cash when I referred to property taken. Based on that, the state challenged him....

THE COURT:
    As to the first juror mentioned, the Court finds those reasons sufficient and the Batson challenge is denied.

MR. DUGAN:

---

[15]/ In actuality, defense counsel miscounted, mistakenly stating that of the first eighteen jurors, "six" were black males and "five" were excused by the state.  See State rec., vol. 7 of 10, trial transcript at pp. 14 and 15.

[16]/ Again, based upon a miscalculation, defense counsel, in actuality, mistakenly represented that a total of "six Black males" were excused by the State.   A possible explanation for the undetected miscount was the fact that neither the prosecutor nor the court kept count with respect to the number of black male jurors struck during voir dire.   The prosecutor admitted that he "didn't mark [his] sheet by race" and the trial judge stated that he "made no notations".   See State rec., vol. 7 of 10, trial transcript at p. 15, lines 21 and 24.

[17]/ See State rec., vol. 7 of 10, trial transcript at p. 17.

As to Mr. Forrest, he indicated upon questioning by the defense, he did not believe that a person who identifies a person in court proves guilt beyond a reasonable doubt.  Based on that, the state challenged him.

THE COURT:
I find that reason sufficient.  The Batson challenge is denied.

MR. DUGAN:
As to Aaron Celestine, Your Honor, in the entire state's voir dire, this juror was slouched down almost to the floor and would not look myself, the prosecutor in the eye.  I had to initial [sic] questions with him and personally speak his name to receive an answer to a general question I asked of the panel.  That, based on his inattentiveness and his body language [indicated] to me that he did not want to be here, the state challenged him.

THE COURT:
I find that sufficient and the Batson challenge is denied.

MR. DUGAN:
As to Jerome Stephenson, Your Honor, that juror was confused when I asked the question about the concept of showing value, did we need to show value.  At first he answered "no" and then he answered "yes".  He also indicated that he was a volunteer juror.  Based on that, the state challenged him.

THE COURT:
Again I find that sufficient and deny the Batson challenge.

MR. DUGAN:
As to the second panel, juror Wilbert Washington. Mr. Washington indicated upon questioning by the defense during voir dire that he wanted to see a video and that a video would take presidence [sic] over witness identification.  Based on that, the state challenged him.

MS. COLE:
Your Honor, may I respond?  The question put to him is whether he thought that a video tape of the incident would be better evidence and quite logically, he answered, if I remember "yes".

MR. DUGAN:

Logic as to who?

MS. COLE:
   Mr. Washington.

MR. DUGAN:
   Are you defining – – are you saying you understand his logic?

MS. COLE:
   I'm saying that that was a reasonable response anybody would make and other people do make that response.

MR. DUGAN:
   I disagree.  I do not think it's reasonable to assume that a video tape is better evidence than a witness identification.  I think that's an assumption that defense counsel is making and she's going into the process of the prosecutor's side as to what facts or questions to ask as to who we want on the jury.  You know, her whole play on this case, Judge, on this voir dire panel was about the video, the video, the video. And based on that, asking questions about what would you think would be better, a video tape or an I.D.  There is a video tape in this case.  The video tape, however, is all messed up and it doesn't show anything.  Based on that, we challenge the juror.

THE COURT:
   I find the answer is sufficient and deny the Batson challenge.

MS. COLE:
   Your Honor, note our objection.
   May I add just one other thing.  As to Mr. Celestine, he's already served on two juries.  He found one defendant guilty as charged and one not guilty, indicating his suitability to serve.

MR. DUGAN:
   I disagree.  In fact, that could be the exact reason why he was slouched down in the seat, is that he is tired of serving and doesn't want to be here and therefore, would be a negative juror to the state's case based on his serving so many times this month.

MS. COLE:
   I think the record will show that others of the excused jurors had already served.

13

THE COURT:
       I note those reasons by the state and as to the
Batson challenge, I deny it.   I note an objection on
behalf of the defense.[18]/

       The trial court, by requiring the State to articulate race

neutral explanations for its challenges, implicitly determined that

defendant had made the requisite "<u>prima facie</u>" case of racial

discrimination.   Similarly, the court, by denying defendant's

<u>Batson</u> challenges, implicitly found that defendant had not carried

his burden of proving purposeful discrimination at step three of

the <u>Batson</u> analysis.   These determinations constitute findings of

fact which are presumed to be correct unless petitioner "rebuts the

'presumption of correctness by clear and convincing evidence.'"

<u>Miller-El</u>, 545 U.S. at ___; 125 S.Ct. at 2325 (<u>quoting</u> 28 U.S.C.

§2254(e)(1)).

       For the following reasons, the Court finds that petitioner has

failed to rebut the "presumption of correctness" associated with

the trial court's finding of no "purposeful discrimination" on the

part of the State in using peremptory challenges to strike five of

the seven black male members of the jury venire.   First, as

reflected in the transcript excerpts quoted above, defendant

offered no rebuttal in response to the prosecution's racially

neutral explanations for striking venire members Alan Wilford,

Jason Forrest, and Jerome Stephenson.[19]/   Second, with respect to

---

[18]/ <u>See</u> State rec., vol. 7 of 10, trial transcript at pp. 17-22.

[19]/ <u>See</u> transcript excerpt <u>supra</u> at pp. 11-12.

14

prospective juror Aaron Celestine, the prosecution struck him based primarily upon his "body language", noting that he was "slouched down" in his chair, almost to the floor, and that he would not look the prosecutor "in the eye". Such explanations, based upon a juror's physical appearance, have been deemed sufficient for purposes of satisfying <u>Batson's</u> second-step burden of proof. <u>See</u> <u>Purkett</u>, 514 U.S. at 769, 115 S.Ct. at 1771 (explanation that juror was struck "because he had long, unkempt hair, a mustache, and a beard" deemed "rac[ially] neutral" and sufficient to satisfy burden of stating nondiscriminatory reason for strike). The only rebuttal offered by defendant was the fact that Celestine had "already served on two juries".[20] However, the prosecution effectively neutralized this rebuttal by noting that Celestine's body language, reflecting disinterest in the proceedings, could well be attributable to the fact that he had already served on two juries and was simply not interested in serving on a third.

Finally, the State's explanation for striking Wilbert Washington was his representation, in response to questioning by the defense, that a video showing petitioner committing the robbery would be more persuasive to him than eyewitness testimony identifying petitioner as the robber. The defense's rebuttal to the above racially neutral explanation was that Mr. Washington's representation was "quite logical[]" in that most people would find

---

[20] <u>See</u> transcript excerpt <u>supra</u> at p. 13.

a videotape of a robbery more compelling than a witness's testimony that a robbery took place.  However, once again, the State offered a response to the defense's rebuttal, arguing that Washington's alleged preference for a videotape was especially prejudicial to its case since the existing videotape was "all messed up" and "[didn't] show anything".[21]/  Also significant, for purposes of discerning whether or not the State's peremptory challenge of Washington was racially motivated, is the fact that the basis for the challenge arose not as a result of questions posed to Washington by the State, but rather, from questions posed by the defense.

In Miller-El, supra, the Supreme Court found evidence of racial motivation behind the State's peremptory challenges to black venire members based upon the questions the State posed to black venire members as compared with its questioning of white venire members.  The Court observed that the State posed more particular, detailed questions to black venire members in an effort to "elicit plausibly neutral grounds for a peremptory strike...." Id. at *14.

As noted above, in this case the basis of the State's challenge, Washington's admitted preference for videotape evidence over eyewitness testimony, was elicited during defense counsel's voir dire questioning.  Accordingly, the State cannot properly be suspected of manufacturing a basis for its peremptory strike in

---

[21]See transcript excerpt supra at p. 13.

order to conceal an actual, racially motivated basis.

Based on the above, the Court finds that the denial of petitioner's <u>Batson</u> was not unreasonable.  As such, petitioner's request for federal habeas corpus relief with respect to this claim is without merit.

### B.   Improper Admission of Out-of-Court Identifications

Petitioner next claims that the trial court erred in allowing police officers to offer inadmissible hearsay testimony. Specifically, petitioner complains that the trial court improperly "permitted police officers to testify regarding the description given to them by Mary Mallet, an eyewitness to three of the five first-degree robberies at issue[]."[22]  Petitioner points to the testimony of New Orleans Police Officers Peggy Martin and Gregory Clay.  Officer Martin, with respect to the August 31, 1996 robbery, testified that "[t]he clerk from McKenzie's told me that an unknown Black male, he was about five-eleven, a hundred and fourty [sic]-five pounds, around thirty-five to forty years of age entered the store."[23]  Officer Gregory Clay, with regard to the September 21, 1996 McKenzie's robbery, testified that Mary Mallett, the bakery employee, described the perpetrator as "approximately thirty, forty

---

[22]/ Federal rec., doc. # 1, petitioner's brief in support of petition for writ of habeas corpus at p. 23.

[23]/<u>See</u> State rec., vol. 7 of 10, trial transcript at p. 93.

years old, five-ten, about a hundred and seventy pounds."[24]/

In addressing petitioner's argument on direct appeal, the
Louisiana Fourth Circuit Court of Appeal reasoned as follows:

> [h]earsay is a statement, other than one made by the
> declarant while testifying at the present trial or
> hearing, offered in evidence to prove the truth of the
> matter asserted. La. C.E. article 801(C).  The article
> further provides that a statement is not hearsay if the
> declarant testifies at trial and is subject to cross-
> examination and the statement offered is "one of
> identification of a person made after perceiving him and
> which confirms the testimony of the declarant that he
> made an identification...." La.C.E. Art. 801(D)(1)(c).
>   In the present case, Ms. Mallet [sic] testified at
> trial concerning the description of the perpetrator she
> gave to the police officers.  The officers' testimony was
> purely corroborative and cumulative of Ms. Mallet's [sic]
> testimony.  As such testimony was not hearsay, the trial
> court did not err in allowing such testimony to be
> admitted into evidence.   This assignment of error is
> without merit.[25]/

In addressing petitioner's claim on habeas review, the
question to be resolved is not whether the trial court's admission
was violative of state law, but rather, whether it rendered the
petitioner's trial fundamentally unfair so as to deny him due
process.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475,
480 (1991); see also Corpus v. Estelle, 571 F.2d 1378, 1381 (5th
Cir.), cert. denied, 439 U.S. 957, 99 S.Ct. 359 (1978)(citing Hills
v. Henderson, 529 F.2d 397, 401 (5th Cir.), cert. denied, 429 U.S.
850, 97 S.Ct. 139 (1976)).  As shown below, in a situation such as

---

[24]/See State rec., vol. 7 of 10, trial transcript at p. 106.

[25]/ A copy of the Louisiana Fourth Circuit's unpublished opinion
is contained in the State rec., vol. 3 of 10.

this, where the objectionable testimony was admitted for identification purposes, a court may look to the strength of the properly admitted evidence concerning the perpetrator's identification in order to determine whether the objectionable testimony was merely cumulative or whether it, in fact, rendered the trial "fundamentally unfair".

In Corpus, supra, petitioner was charged with and ultimately convicted of rape. At trial, the victim unequivocally identified petitioner as the man who, under the guise of being a gas company employee, entered her house and raped her, testifying that she was with petitioner for approximately 30 minutes and that she "got a good look at his face". Id. at 1381 n.3. The prosecution, however, in addition to offering the victim's testimony regarding the perpetrator's identity, also offered the testimony of two other women. One of these women testified that three days before the pertinent rape, petitioner came to her house posing as a gas company employee. A second woman testified that approximately two weeks after the rape, petitioner, armed with a knife, broke into her home and cut her on the hand. Corpus, 571 F.2d at 1381.

Characterizing the above-described testimony as objectionable "other-crimes evidence", petitioner claimed that he was entitled to habeas corpus relief based upon its wrongful admission. The Fifth Circuit, however, deemed that the two women's testimony, "[a]t worst", was "cumulative", given the "convincing testimony" offered

by the victim.   The court reasoned that:

> [t]he very strength of [the victim's] testimony ... makes
> it  impossible  for  [petitioner]  to  prove  that  the
> prejudicial  effect  of  the  other-crimes  evidence  was  a
> "crucial,  critical,  (and)  highly  significant  factor"  in
> his conviction, ... and without this proof [petitioner's]
> due process claim fails.  <u>Anderson v. Maggio</u>, 555 F.2d
> 447, 451 (5th Cir. 1977).

<u>Corpus</u>, 571 F.2d at 1381 (citations omitted).

In  the  instant  matter,  just  as  in  <u>Corpus</u>,  <u>supra</u>,  the
eyewitness testimony identifying petitioner as the perpetrator was
very strong indeed.  Mary Mallett testified that she got a fairly
good look at petitioner, estimating that he was in the bakery for
four to five minutes.[26]  On the second occasion petitioner entered
the bakery while Mallett was at work, she recognized him "[a]s soon
as he walked in the door".[27]  Finally, in connection with the third
time petitioner robbed the St. Claude Avenue McKenzie Bakery during
Mallett's work shift, there was no doubt in her mind that he was
the same person who had robbed the business on the two prior two
occasions.  At trial, the following exchange took place:

> EXAMINATION BY MR. DUGAN:
> Q.  Ms. Mallett, is there any doubt in your mind that the
> defendant, sitting right there is the same defendant that
> robbed you on three different occasions?
>
> A.  He is the same man, all three times.
>
> Q.  Are you sure?

---

[26]/ <u>See</u> State rec., vol. 7 of 10, trial transcript at p. 146.

[27]/ <u>See</u> State rec., vol. 7 of 10, trial transcript at p. 148, lines
13-14.

A.  Positive.

Q.  You have no doubt?

A.  No doubt.[28]/

Based upon the strength of Mary Mallett's identification of petitioner as the perpetrator, the Court finds that the hearsay testimony of Officers Martin and Clay was merely cumulative and its admission did not render petitioner's trial "fundamentally unfair", and, therefore, did not constitute a violation of petitioner's due process rights.  Petitioner's second claim is without merit.

### C. Unconstitutionality of Predicate Offense/Excessiveness of Sentence

Petitioner contends that the trial court erred in adjudicating him to be a third felony offender since one of the predicate offenses, a 1987 simple burglary conviction, could not properly be used to enhance his sentence due to the State's failure to present evidence reflecting that his 1987 conviction was constitutional. Specifically, petitioner complains that the State failed to show that he knowingly and voluntarily waived his constitutional rights in connection with his guilty plea in 1987.  However, petitioner's claim in this regard is without merit in light of the Supreme Court's holding in Lackawanna County District Attorney v. Coss, 532 U.S. 394, 396, 121 S.Ct. 1567, 1570 (2001), wherein the Supreme Court determined that generally, "federal postconviction relief is

---

[28]/See State rec., vol. 7 of 10, trial transcript at p. 161, lines 2-12.

[not] available when a prisoner challenges a current sentence on the ground that it was enhanced based on an allegedly unconstitutional prior conviction for which the petitioner is no longer in custody."  The Court reasoned that:

> [o]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid....  If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under §2254 on the ground that the prior conviction was unconstitutionally obtained.

Lackawanna, 532 U.S. at 403-04, 121 S.Ct. at 1574.[29]/

Here, petitioner makes no allegation that his 1987 guilty plea was entered without counsel being present.  As such, the predicate conviction could properly be used to enhance his present sentence.

Petitioner also complains that the life sentence he received following his adjudication as a multiple offender is violative of the constitutional prohibition against cruel and unusual punishment.  In support of this claim, petitioner points to the

---

[29]/ There are two exceptions to the above general rule.  One exception is with respect to habeas petitions challenging an enhanced sentence "on the basis that the prior conviction used to enhance the sentence was obtained where there was a failure to appoint counsel in violation of the Sixth Amendment...." Lackawanna, 532 U.S. at 404, 121 S.Ct. at 1574.  The second exception might lie, albeit in a rare circumstance, where through no fault of his own, there was no channel of review actually available to petitioner through which he might have timely challenged his prior conviction.  Lackawanna, 532 U.S. at 405, 121 S.Ct. at 1575.  Neither of these exceptions are applicable in the instant situation.

fact that in connection with his robberies, he never harmed anyone. He simply "walked into [McKenzie's]", "asked for money", then "promptly left the premises".[30]/

Applicable Supreme Court precedent makes clear that the fact that a petitioner's conviction is based upon a non-violent crime does not render his or her life sentence, imposed as a result of prior convictions, unconstitutionally excessive.   In <u>Rummel v. Estelle</u>, 445 U.S. 263, 100 S.Ct. 1133 (1980), petitioner was convicted of felony theft in connection with his acquisition, by false pretenses, of $120.75.  Petitioner was further determined to have been convicted of two prior felonies, specifically, fraudulently using a credit card to obtain $80.00 worth of goods or services, and passing a forged check in the amount of $28.36. Thereafter, in accordance with the Texas recidivist statute,[31]/ the trial court imposed upon petitioner a mandatory life sentence. Petitioner argued that such a sentence "was 'grossly disproportionate' to the three felonies that formed the predicate for his sentence and that therefore the sentence violated the ban on cruel and unusual punishments of the Eighth and Fourteenth Amendments."   <u>Rummel</u>, 445 U.S. at 265, 100 S.Ct. at 1134.   The

---

[30]/ <u>See</u> Federal rec., doc. # 1, petitioner's brief in support of petition for writ of habeas corpus at p. 33.

[31]/The statute provided, in pertinent part, that "[w]hoever shall have been three times convicted of a felony less than capital shall on such third conviction be imprisoned for life in the penitentiary."

Supreme Court disagreed, reasoning that:

> at the time that [petitioner] obtained the $120.75 by
> false pretenses, he already had committed and had been
> imprisoned for two other felonies, crimes that Texas and
> other States felt were serious enough to warrant
> significant terms of imprisonment even in the absence of
> prior offenses. Thus the interest of the State of Texas
> here is not simply that of making criminal the unlawful
> acquisition of another person's property; it is in
> addition the interest, expressed in all recidivist
> statutes, in dealing in a harsher manner with those who
> by repeated criminal acts have shown that they are simply
> incapable of conforming to the norms of society as
> established by its criminal law....
>
>     Nearly 70 years ago, ... this Court rejected an
> Eighth Amendment claim that seems factually
> indistinguishable from that advanced by Rummel in the
> present case. In Graham v. West Virginia, 224 U.S. 616,
> 32 S.Ct. 583, 56 L.Ed. 917 (1912), this Court considered
> the case of an apparently incorrigible horse-thief who
> was sentenced to life imprisonment under West Virginia's
> recidivist statute. In 1898 Graham had been convicted of
> stealing "one bay mare" valued at $50; in 1901 he had
> been convicted of "feloniously and burglariously"
> entering a stable in order to steal "one brown horse,
> named Harry, of the value of $100"; finally, in 1907 he
> was convicted of stealing "one red roan horse" valued at
> $75 and various tack and accessories valued at $85. Upon
> conviction of this last crime, Graham received the life
> sentence mandated by West Virginia's recidivist statute.
> This Court did not tarry long on Graham's Eighth
> Amendment claim, noting only that it could not be
> maintained "that cruel and unusual punishment [had] been
> inflicted." Id., at 631, 32 S.Ct., at 588.

Rummel, 445 U.S. at 276-77, 100 S.Ct. at 1140-41 (footnotes

omitted). See also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166

(2003)(habeas relief denied with respect to petitioner's claim that

his sentence of two consecutive terms of 25 years to life under

"California's three strikes law," resulting from his conviction on

two felony counts of petty theft along with a prior conviction,

violated the constitutional prohibition against cruel and unusual punishment).  Accordingly, petitioner's claim that his life sentence constitutes an unconstitutionally excessive sentence is without merit.

**D.  Improper Acceptance of Defective Jury Verdict**

Though his argument is less than crystal clear,[32]/ petitioner appears to be claiming that the jury's five verdicts were defective because each failed to specify the particular count to which it was related.  However, as the state trial court noted in denying the instant claim in connection with petitioner's state application for post-conviction relief, each of the five verdict sheets "were labeled with count one through five on them."[33]/  Further, on each verdict sheet,[34]/ the jury foreperson was instructed to write the jury's verdict on the back of the sheet.  Thus, even though the foreperson's handwritten verdicts may not have specified the count to which it related, each handwritten verdict was located on the back of a verdict sheet which did specify the corresponding count. Additionally, as the State points out in its response (federal

---

[32]/ The State, in its response (federal rec., doc. # 7, p. 17), asserts:  "[T]his court will be hard pressed to understand exactly what petitioner is alleging as error...."

[33]/ A copy of the state trial court's post-conviction Judgment is contained in the State rec., vol. 10 of 10.

[34]/ Copies of the verdict sheets are contained in the State rec., vol. 10 of 10, directly behind the trial court's post-conviction Judgment.

rec., doc. # 7, p. 18), as evidenced by its minute entry, the trial court had no doubt as to which verdict related to which count, specifying:

> AS TO COUNT ONE, WE THE JURY FIND THE DEFENDANT GUILTY OF FIRST DEGREE ROBBERY.
>
> AS TO COUNT TWO, WE THE JURY FIND THE DEFENDANT GUILTY OF FIRST DEGREE ROBBERY.
>
> AS TO COUNT THREE, WE THE JURY FIND THE DEFENDANT GUILTY OF FIRST DEGREE ROBBERY.
>
> AS TO COUNT FOUR, WE THE JURY FIND THE DEFENDANT GUILTY OF SIMPLE ROBBERY.
>
> AS TO COUNT FIVE, WE THE JURY FIND THE DEFENDANT GUILTY OF FIRST DEGREE ROBBERY.[35]/

This claim is without merit.

### E. Insufficiency of Evidence

Though not specified as one of his grounds for relief, petitioner, at the end of his supporting brief (federal rec., doc. # 1, p. 39), claims that insufficient evidence was submitted to support his conviction in connection with the September 7, 1996[36]/ robbery of the St. Claude Avenue McKenzie Bakery.  The Court notes that Price failed to present this allegation to the state courts in his direct criminal appeal or in the context of his application for post-conviction relief.  As such, petitioner has failed to satisfy

---

[35]/ A copy of the court's minute entry is contained in the State rec., vol. 1 of 10.

[36]/ In his brief, petitioner mistakenly sets forth that the robbery occurred on September 2, 1996, rather than September 7, 1996.

the exhaustion requirement set forth in §2254(b)(1)(A).  Related to the exhaustion requirement is the doctrine of procedural default, another separate but distinct limit on the availability and scope of federal habeas review.  See Nobles v. Johnson, 127 F.3d 409, 420-23 (5th Cir. 1997), cert. denied, 523 U.S. 1139, 118 S.Ct. 1845 (1998).  "A procedural default ... occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims would now find the claims procedurally barred.'"  Id. at 420 (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 2557 n.1 (1991); Sones v. Barnhart, 61 F.3d 410, 416 (5th Cir. 1995).

With limited exceptions not relevant here, Article 930.8 of the Louisiana Code of Criminal Procedure provides that no application for post-conviction shall be considered by the state courts if it is filed more than two years after the judgment of conviction and sentence of a defendant have become final.  The Fifth Circuit has determined that Article 930.8 constitutes an independent and adequate state rule that is regularly applied by the state courts.  Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997), cert. denied, 523 U.S. 1125, 118 S.Ct. 1811 (1998).

Price has never presented his insufficiency-of-the-evidence allegation to the state's highest court for its consideration and the time for him to do so has expired under Article 930.8.  Accordingly, federal habeas review of that allegation is barred

27

unless Price can establish cause for his procedural default and actual prejudice as a result of the alleged constitutional violation, or if she can demonstrate that the failure to entetain the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750, 111 S.Ct. at 2565. As no external impediment prevented Price from urging his insufficiency-of-the-evidence claim in his application for post-conviction relief and prior to the expiration of the time period prescribed by Article 930.8, he cannot make the required showing of prejudice. Moore v. Roberts, 83 F.3d 699, 704 (5th Cir. 1996), cert. denied, 519 U.S. 1093, 117 S.Ct. 772 (1997). Without a showing of cause, the Court need not consider the element of prejudice. Murray v. Carrier, 477 U.S. 478, 494-95, 106 S.Ct. 2639, 2649 (1986). And because Price makes no colorable showing of actual innocence, he has not shown that a fundamental miscarriage of justice will occur if his procedurally defaulted claim is not considered. Glover, 128 F.3d at 904.

**RECOMMENDATION**

It is therefore **RECOMMENDED** that the petition of Stewart Price

28

for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this __30th__ day of _____October_____, 2006.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE